FILED

2006 Oct-23  AM 11:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **LEAANN D. JOHNSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Civil Action No. CV-04-S-3414-NE** |
| | ) |
| **BLUE CROSS AND BLUE** | ) |
| **SHIELD OF ALABAMA, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Plaintiff, LeeAnn D. Johnson, filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., against defendant Blue Cross and Blue Shield of Alabama, Inc.[1]  Plaintiff claims that defendant, acting as claims administrator of the group health insurance policy under which she is a beneficiary, erroneously characterized a surgical procedure recommended to her by her treating physicians as "investigational."[2]  The effect of that label was to exclude the procedure requested from the scope of the policy's coverage.[3]  Plaintiff seeks a declaratory judgment that defendant violated ERISA, and an order requiring

---

[1] Doc. no. 1 (Complaint).

[2] *Id.*

[3] *Id.*

defendant to cover the costs attendant to performance of the procedure.[4]

The action now is before the court on cross motions for summary judgment filed by plaintiff and defendant.[5]  In disposing of these motions, the court must also address defendant's motion to strike certain of plaintiff's evidentiary submissions.[6] For the reasons set forth below, plaintiff's motion for summary judgment is due to be granted.  Accordingly, defendant's motion for summary judgment will be denied. Moreover, because the court need not consider any of plaintiff's evidentiary submissions to resolve the case in her favor, defendant's motion to strike is due to be denied as moot.

## PART ONE

*Summary Judgment Standards*

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (emphasis supplied).

---

[4] *Id.*

[5] Doc. no. 25 (Plaintiff's Motion for Summary Judgment); doc. no. 20 (Defendant's Motion for Summary Judgment).

[6] Doc. no. 26 (Defendant's Motion to Strike).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Likewise, "summary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party' [if the case proceeded to trial]." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 251 (1986) (internal citations omitted).

In either situation, the relevant question is whether the admissible evidence on file "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). *See also Anderson*, 477

U.S. at 251-52 (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Because cross motions for summary judgment are presented, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at 335-36 (1998) (footnote omitted). *See also*, *e.g.*, *Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986). Further, the court is required to "relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment." *Serrano-Cruz v. DFI Puerto Rico*, *Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

## Part Two

### Summary of Relevant Facts [7]

Plaintiff is a 41-year-old female who suffers from morbid obesity.[8] She is also

---

[7] The facts in this section are drawn primarily from the 648-page Stipulated Administrative Record (doc. no. 9). The Administrative Record is a long, disorganized, and unwieldy amalgam of documents, many of which are duplicative. Moreover, much of the content of the Administrative Record consists of multi-page items, but there are no dividers indicating where one set of documents ends, and the next begins. Thus, the court will specify not only the page number cited, but will also supply the name and page numbers of the larger document from which the pinpoint citation is drawn.

[8] Doc. no. 9, Gastric Restrictive Procedures Form, p. 2. Morbid obesity is "an increase in weight over optimal weight that results in significant medical complications and a shortened life

a beneficiary under an ERISA-governed group medical insurance plan established by her husband's employer, Book Systems, Inc.[9]  Book Systems, Inc. is the plan sponsor and plan administrator.[10]  Defendant, Blue Cross and Blue Shield of Alabama, Inc., is the claims administrator and insurer under the Book Systems plan.[11]  In that capacity, defendant fields authorization requests, exercises discretion to determine what benefits are available to plan members, and pays claims.[12]

## A.    The Book Systems Policy

The contours of plaintiff's health insurance policy are outlined in a document called the "Summary Plan Description."[13]  Relevant here are the following three explicit benefit exclusions, which are listed under the heading "Health Benefit Exclusions" within the Summary Plan Description:

---

span." Doc. no. 21 (Defendant's Brief in Support of Summary Judgment), Defendant's Statement of Undisputed Facts, ¶ 28.  Plaintiff falls within the commonly accepted parameters for defining morbid obesity, as her body mass index ("BMI") is 43, and she suffers from a variety of "co-morbidities," such as glucose intolerance and high cholesterol.  *Id*. at ¶ 29; doc. no. 9, Initial Medical Necessity Predetermination Request, pp. 5-6.  A "co-morbidity" is "[a] concomitant but unrelated pathological or disease process."  THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/browse/comorbidity (last visited Oct. 3, 2006).

[9] Doc. no. 21, Defendant's Statement of Undisputed Facts, ¶ 1.

[10] Doc. no. 9, Summary Plan Description (SPD) (pp. 274-324), p. 324.

[11] *Id*. at p. 309 ("The employer has delegated to [defendant] the discretionary responsibility and authority to construe, interpret, and administer the plan, and to perform every other act necessary or appropriate in connection with our provision of administrative services under the plan.").

[12] *See id*. at p. 324.

[13] *See generally id*. at pp. 274-324.

**We will not** provide benefits for the following:

1.    Services or expenses we determine are not medically necessary.
       . . .
13.    Investigational treatment [or] procedures. . . .
       . . .
22.    Services or expenses for treatment of any condition including, but not limited to, obesity, diabetes, or heart disease, which is based upon weight reduction or dietary control or services or expenses of any kind to treat obesity, weight reduction or dietary control. *This exclusion does not apply to surgery for morbid obesity if medically necessary and in compliance with guidelines of the Claims Administrator*. Benefits will only be provided for one surgical procedure for obesity (morbid) in a lifetime. Benefits will not be provided for subsequent surgery for complications related to a covered surgical procedure for obesity (morbid) if the complications arise from non-compliance with medical recommendations regarding patient activity and lifestyle following the procedure.[14]

The appellations "investigational" and "medically necessary" are clearly terms of art,

and they are defined in the "Definitions" portion of the Summary Plan Description.

The pertinent definitions are reproduced in material part below.

    **Medically Necessary or Medical Necessity:** We use these terms to help us determine whether a particular service or supply will be covered. When possible, we develop written criteria (called medical criteria) that we use to determine medical necessity. We base these criteria on peer-reviewed literature, recognized standards of medical practice, and technology assessments. We put these medical criteria in policies that we make available to the medical community and our members. We do this so that you and your providers will know in advance, when possible, what we will pay for. If a service is not medically necessary according

---

[14] *Id*. at pp. 312-316 (boldface type in original, other emphasis supplied).

to one of our published medical criteria policies, we will not pay for it. If a service or supply is not addressed by one of our published medical criteria policies, we will consider it to be medically necessary only if we determine that it is:

- appropriate and necessary for the symptoms, diagnosis, or treatment of your medical condition;

- provided for the diagnosis or direct care and treatment of your medical condition;

- in accordance with standards of good medical practice accepted by the organized medical community;

- not primarily for the convenience and/or comfort of you, your family, your physician, or another provider of services;

- not "investigational;"

. . . .

**Investigational:** Any treatment, procedure, equipment, drugs, drug usage, or supplies that either we have not recognized as having scientifically established medical value, or that does not meet generally accepted standards of medical practice. When possible, we develop written criteria (called medical criteria) concerning services or supplies that we consider to be investigational. We base these criteria on peer-reviewed literature, recognized standards of medical practice, and technology assessments. We put these medical criteria in policies that we make available to the medical community and our members. We do this so that you and your providers will know in advance, when possible, what we will pay for. If a service or supply is considered investigational according to one of our published medical criteria policies, we will consider it to be non-investigational only if the following requirements are met:

- The technology must have final approval from the

appropriate government regulatory bodies;

- The scientific evidence must permit conclusions concerning the effect of the technology on health outcomes;

- The technology must improve the net health outcome;

- The technology must be as beneficial as any established alternatives; and,

- The improvement must be attainable outside the investigational setting.[15]

Dr. Patrick Ryce, Senior Vice President and Medical Director for defendant Blue Cross and Blue Shield of Alabama, explained defendant's interpretation of these provisions in a declaration attached to defendant's motion for summary judgment. According to Dr. Ryce, "if one of Blue Cross's written medical policies states that a particular procedure or technology is considered 'investigational,' and therefore, not medically necessary, that directive controls and Blue Cross will not cover the procedure," even though it meets the other requirements for being characterized as "medically necessary."[16] As should be clear from the definitional language, however, the initial characterization of a particular procedure or technology as "investigational"

---

[15] *Id*. at pp. 318-19 (boldface type in original).

[16] Doc. no. 22 (Declaration of Dr. Patrick Ryce), ¶ 6.

in a written policy does not necessarily close the door on the issue.[17]  Rather, the

determination in the written directive will endure only until such time as the

procedure in question "meets the five criteria for non-investigational [procedures] set

forth in the definition of 'investigational.'"[18]  Upon satisfying those five criteria, the

procedure will no longer be subject to exclusion under the policy — assuming, of

course, that it also satisfies all of the additional requirements for characterization as

a "medical necessity."

The definitions also refer to the protocol used in developing the written

medical criteria.  Specifically, "peer-reviewed literature, recognized standards of

medical practice, and [internally created] technology assessments" are all relevant to

deciding whether a given procedure should be classified as "investigational" or "non-

investigational."[19]  Dr. Ryce stated in his declaration that "[r]andomized, double-

blind, controlled studies are considered the gold standard of evidence-based decision

making," but conceded that such studies are often not available.[20]  In such a situation,

---

[17] *See id.* at ¶ 12 ("As Blue Cross's Medical Director, I review and analyze the medical literature on an ongoing basis and make determinations whether the current medical literature at any given time supports that [*sic*] a medical service or procedure should no longer be considered investigational by Blue Cross.").

[18] *Id.* at ¶ 7.

[19] Doc. no. 9, SPD, p. 318.  Medical literature is considered peer-reviewed if it is selected for publication in a medical journal after two or more blind reviews by qualified individuals.  *See* doc. no. 22, ¶ 10.

[20] Doc. no. 22, ¶ 10.  A "double-blind" study — one in which neither the doctor nor the patient are aware of which treatment the patient is receiving — is clearly impossible (or at least

other evidence, including solicited opinions from practitioners in the relevant discipline, are utilized.[21]   As for *who* weighs the evidence, Dr. Ryce stated that he personally reviews the literature, but that defendant's Medical Advisory Committee — a group of independent, board-certified doctors of various specializations — is consulted as well.[22]

## B.   Plaintiff's Requests for Coverage

Because plaintiff's morbid obesity is potentially life-threatening, her primary care physician, Dr. Barbara Bennett, and her consulting bariatric surgeon, Dr. John D. Husted, recommended that she undergo a laparoscopic surgical procedure known as a Biliopancreatic Diversion with Duodenal Switch ("BPD/DS").[23]   As discussed more fully below, BPD/DS is just one of several available weight loss surgeries, but it is the one that plaintiff and her doctors felt best suited her.

By letter dated December 21, 2003, Dr. Husted submitted to defendant a

---

*inadvisable*) in the context of a surgical procedure.   *See*, *e.g.*, http://en.wikipedia.org/wiki/Double-blind (last visited Oct. 3, 2006) (defining "double-blind" and discussing impossibility of utilization in the surgical realm).

[21] Doc. no. 22, ¶ 10.

[22] *Id.* at ¶¶ 8, 12.

[23] Doc. no. 9, Initial Medical Necessity Predetermination Request, pp. 5-6; *id.* at Letter from Dr. Bennett, p. 7.   A laparoscopic procedure is one in which the surgeon utilizes a "flexible fiberoptic instrument" called a laparoscope, which is "passed through a small incision in the abdominal wall."   THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/search?r=2&q=laparoscopic  (last visited Sept. 29, 2006).

request for a "Medical Necessity and Benefits Predetermination," asking that plaintiff receive coverage for the proposed BPD/DS surgery.[24]   In his letter, Dr. Husted described plaintiff's medical condition and her previous unsuccessful attempts to lose weight through less drastic measures, and generically recommended bariatric surgery as the best option for safe and effective treatment of morbid obesity.[25]  On January 7, 2004, defendant summarily denied the request, stating in a letter to Dr. Husted that "laparoscopic duodenal switch for treatment of morbid obesity is considered investigational by Blue Cross and Blue Shield of Alabama and is not covered."[26]  The denial of coverage was dictated by defendant's written medical policy, in effect at the time of the request, which deems BPD/DS surgery "investigational."[27]

Upon receiving the denial, Dr. Husted submitted a second letter, this time asking for a predetermination that defendant would cover a different surgical procedure, the Roux-en-Y gastric bypass ("RNY").[28]  Defendant notified Dr. Husted on February 6, 2004 that plaintiff met the medical criteria for the RNY, and that

---

[24] Doc. no. 9, Initial Medical Necessity Predetermination Request, pp. 5-6.  *See also* doc. no. 21, Defendant's Statement of Undisputed Facts, ¶ 49.

[25] Doc. no. 9, Initial Medical Necessity Predetermination Request, pp. 5-6.

[26] *Id*. at Letter Denying First Request for BPD/DS, p. 11.

[27] *Id*. at Blue Cross & Blue Shield of Alabama Gastric Restrictive Procedures Policy (Gastric Restrictive Procedures Policy) (pp. 325-331), pp. 327-328.

[28] *Id*. at RNY Medical Necessity Predetermination Request (pp. 14-15), p. 14; doc. no. 21, Defendant's Statement of Undisputed Facts, ¶ 53.  The differences between the RNY and BPD/DS procedures will be explained in detail below.

coverage would accordingly be provided for *that* procedure.[29]   That same day, Dr. Husted requested that defendant reconsider its previous denial of coverage for the BPD/DS surgery, and supported his request with a copy of Blue Cross and Blue Shield of Tennessee's policy on bariatric surgery, which apparently authorizes the BPD/DS procedure.[30]   Again, defendant denied the request for BPD/DS coverage, concluding that "[under] the terms of this patient's contract, this procedure would be considered investigational and not covered."[31]   The unnamed customer service representative who authored the denial letter explained:  "This is not a reflection on the type of service recommended, but simply a service that is excluded under the terms of the patient's contract."[32]

In the months that followed, plaintiff and/or her attorneys wrote numerous additional letters requesting reconsideration of the coverage decision.[33]   Along with many of these letters, plaintiff or her attorneys included medical literature and myriad other materials discussing the merits of the BPD/DS procedure.[34]   On two occasions, plaintiff requested copies of all documents relied upon by defendant in reviewing her

---

[29] Doc. no. 21, Defendant's Statement of Undisputed Facts, ¶¶ 54-56; doc. no. 9, Letter Approving Request for RNY Procedure (pp. 17-18), p. 17.

[30] Doc. no. 21, Defendant's Statement of Undisputed Facts, ¶ 58.

[31] Doc. no. 9, Letter Denying Second Request for BPD/DS, p. 28.

[32] *Id.*

[33] Doc. no. 21, Defendant's Statement of Undisputed Facts, ¶ 66.

[34] *See*, *e.g.*, *id.* at ¶¶ 67, 80, 87, 88, 91, 102, 110, 125

previous appeals, and a statement explaining how the principles contained in any such materials justified the policy determination that the BPD/DS procedure was "investigational."[35]   Throughout this process, defendant continually reviewed the medical literature and remained steadfast in the conclusion that the BPD/DS is "investigational," and therefore not covered, even though its representatives were not very specific in explaining this position:   they simply stated that the literature indicated "significant outcome problems" with the BPD/DS.   Dr. Ryce has been more forthcoming at the summary judgment stage, however, and a declaration containing his gloss on the medical evidence in the Administrative Record is the primary document upon which defendant now relies.

## C.   The Medical Evidence

The Administrative Record in this case is heavily laden with medical literature, much of which is devoted to explaining the techniques for performing various types of surgical procedures for morbid obesity, and distinguishing one variety from the others.   The court is pleased to announce that its central concern is not the distinctions

---

[35] *Id*. at ¶¶ 100, 107.   Defendant did respond (at least partially) to this request, providing 266 pages of medical literature and other documents deemed to support the "investigational" classification.   *See generally* doc. no. 9, Response to Request for Information (pp. 273-539). Arguably, however, no explanation of the application of this scientific evidence to the facts at hand appears in the Administrative Record, however.   In her motion for summary judgment, plaintiff repeatedly claims a right to damages under ERISA for defendant's failure to provide this explanation.   The court will confront this request *infra.*.

in the *methods* employed, but the differences, if any, in the *results* obtained and *complications* suffered.   Therefore, a brief comparison of the BPD/DS and RNY procedures will suffice.

### 1.    Overview of the BPD/DS and RNY surgeries

Both of the gastric surgeries at issue in this case involve tinkering with the arrangement of the small intestine, and adjusting the size of the stomach itself.  In an unaltered system, food travels down the esophagus and is digested in the stomach.[36] The stomach has an opening at the bottom, commonly called the "gastric outlet."[37] During digestion, however, the gastric outlet is sealed by the "pylorus," a muscular valve that opens and closes as necessary.[38]  When the pylorus does open, it allows food to enter into the upper portion of the small intestine, or the "duodenum."[39]  From there, the food continues to move through the small intestine, first reaching the

---

[36] The information in this paragraph is drawn in part from the various diagrams in the Administrative Record.  *See generally* doc. no. 9, pp. 191, 196-97, 449, 359, 568.

[37] *See, e.g.*, http://www.medterms.com/script/main/art.asp?articlekey=39898 (last visited Oct. 3, 2006) (defining "gastric outlet" as "[t]he exit from the stomach through the pyloric channel and duodenum").

[38] *See, e.g.*, THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/browse/pylorus (last visited Oct. 3, 2006) (defining "pylorus"); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1393 (W.B. Saunders Co. 28th ed. 1994).

[39] *See, e.g.*, MERRIAM-WEBSTER'S MEDICAL DICTIONARY (Merriam-Webster, Inc. 2002), *at* http://dictionary.reference.com/browse/duodenum (last visited Oct. 3, 2006) (defining "duodenum"); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 511 (W.B. Saunders Co. 28th ed. 1994).

middle section (called the "jejunum"), and finally arriving at the terminal portion (called the "ileum").[40]  Subsequently, the mostly digested food pours into the large intestine through the "cecum," a large pouch-like formation.[41]

An assortment of obesity surgeries currently on the market change this process with the goal of inducing significant weight loss.   One document in the Administrative Record divides the available procedures into three categories:

- *Gastric restrictive surgical procedures* create a small gastric pouch, resulting in weight loss for early satiety[42] and decreased dietary intake.  The decreased capacity of the stomach reduces the volume of food an individual consumes before feeling full.

- *Combination surgical procedures* include decreasing the stomach capacity and bypassing part of the digestive tract.  They combine food malabsorption[43] and [a reduction in] the volume of food an

---

[40] *See, e.g.*, THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/browse/jejunum (last visited Oct. 3, 2006) (defining "jejunum"); *id. at* http://dictionary.reference.com/browse/ileum (last visited Oct. 3, 2006) (defining "ileum"); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 869, 819 (W.B. Saunders Co. 28th ed. 1994).

[41] *See, e.g.*, THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/browse/cecum (last visited Oct. 3, 2006) (defining "cecum"); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 283 (W.B. Saunders Co. 28th ed. 1994).

[42] "Satiety" means simply "the quality or state of being fed or gratified to or beyond capacity."   MERRIAM-WEBSTER'S MEDICAL DICTIONARY (Merriam-Webster, Inc. 2002), *at* http://dictionary.reference.com/browse/satiety (last visited Oct. 3, 2006).  *See also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1486 (W.B. Saunders Co. 28th ed. 1994).

[43] "Malabsorption" is a description for "inadequate absorption of nutrients from the intestinal tract." THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/browse/Malabsorption (last visited Oct. 3, 2006).  *See also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 980 (W.B. Saunders Co. 28th ed. 1994).

individual can consume.

- *Malabsorptive surgical procedures* bypass a section of the small intestines.   Weight loss results from intestinal malabsorption without dietary modification.[44]

Both the RNY and BPD/DS fall into the category of "combination surgical procedures," because they are intended to make use of both the malabsorptive and restrictive approaches.[45]

The RNY procedure is an older technique than the BPD/DS, tracing its roots to 1969;[46] at present, it is by far the most commonly performed obesity surgery.[47] The

_____

[44] Doc. no. 9, at Blue Cross Blue Shield of Tennessee Bariatric Surgery Policy (pp. 23-26), p. 23 (emphasis supplied).  Dr. Ryce apparently disagrees with the tripartite categorization of obesity procedures, and cites to two of defendant's internal manuals for the proposition that there are only two categories:  gastric restrictive procedures, and malabsorptive procedures.  *See* doc. no. 22, ¶ 17 (citing doc. no. 9, Blue Cross Blue Shield Association Medical Policy Reference Manual (pp. 342-353), p. 342; *id*. at Blue Cross Blue Shield Association Technology Evaluation Center Assessment (TEC) (pp. 354-405), p. 358).  It is worth pointing out that the very TEC upon which Dr. Ryce relies acknowledges that "[s]ome operations, such as gastric bypass with Roux-en-Y, *combine elements of restrictive surgery with malabsorptive surgery*."  Doc. no. 9, TEC, p. 358 (emphasis supplied). *See also id*. at Douglas S. Hess & Douglas W. Hess, *Biliopancreatic Diversion with a Duodenal Switch*, 8 Obes. Surgery 267 (1998) (Hess & Hess) (pp. 195-216), p. 215 (noting that the BPD/DS "is both a restrictive and a malabsorption procedure").

[45] Doc. no. 9, TEC, p. 358 (explaining that "[s]ome operations, such as gastric bypass with Roux-en-Y, combine elements of restrictive surgery with malabsorptive surgery"); *id*. at Hess & Hess, p. 215 (observing that the BPD/DS "is both a restrictive and a malabsorption procedure"); *id*. at American Society for Bariatric Surgery, *Rationale for the Surgical Treatment of Morbid Obesity* (ASBS Rationale) (pp. 498-512), p. 507 (noting that BPD/DS is "designed to incorporate a maximum of malabsorption along with a degree of gastric restriction").

[46] *Id*. at Daniel R. Cottam *et al*., *Laparoscopic Era of Operations for Morbid Obesity*, 138 Arch. of Surgery 367 (2003) (Cottam *et al*.) (pp. 479-487), p. 483 (noting constant evolution since 1969).

[47] Doc. no. 21, Defendant's Statement of Undisputed Facts, ¶ 33.  *See also* doc. no. 9, TEC, p. 358 (noting that the RNY is performed in 70% of gastric surgeries and that the Blue Cross Blue

procedure involves "a horizontal or vertical partitioning of the stomach, which results in a 90% restriction [in stomach size and capacity].  It is followed by a Roux Y procedure in which the small intestine is reconfigured into a Y consisting of two limbs and a common channel."[48]  In the end, the gastric outlet of the stomach is no longer connected to the duodenum, but instead is fused with the jejunum, resulting in a shorter intestinal pathway.[49]  This sort of gastric bypass

> not only prevents the ability to ingest larger volumes [of food] at any one meal, but also induces a "dumping syndrome" if the patient ingests too much food or a high-sugar liquid meal.  This unpleasant "dumping syndrome," occurs when a large amount of partially digested food is delivered directly to the part of the small intestine from the stomach and can cause nausea, weakness, sweating, faintness, abdominal pain and vomiting. . . . Since a major portion of digestion occurs in the stomach — specifically in the process of breaking down food into nutrients — the amount of nutrients available for absorption is also reduced.[50]

Like the RNY, the BPD/DS dates back many years, but it is not as old as the RNY, and it was modified several times before reaching its present form.[51]  In 1979, an article by Dr. Nichola Scopinaro described the Biliopancreatic Diversion *without*

---

Shield TEC has approved of the RNY since 1988).

[48] Doc. no. 9, Anthem Medical Policy (pp. 253-266), p. 258.

[49] *See id.* at TEC, p. 358.

[50] *Id*. at Anthem Medical Policy, p. 258.

[51] *Id*. at Robert Rabkin, *The Duodenal Switch as an Increasing and Highly Effective Operation for Morbid Obesity*, 14 Obes. Surgery 861 (2004) (Rabkin) (pp. 242-246), pp. 244, 245 (stating that the BPD/DS in its present form has been performed for over 15 years and is currently performed by at least 104 different surgeons).

*duodenal switch* ("BPD") as "a mixed or hybrid surgery consisting of restrictive . . . and malabsorptive . . . components."[52]  The BPD turned out to be somewhat of a dangerous procedure, due primarily to a high incidence of post-operative protein malnutrition (one estimate at 11.9%) and anemia (one estimate at 35%).[53]  In 1988, Drs. Douglas W. Hess and Douglas S. Hess used "a combination of Dr. Scopinaro's biliopancreatic diversion and Dr. DeMeester's duodenal switch procedures . . . [and] developed a hybrid which has the advantages of the [BPD] without some of the associated problems."[54]  This BPD/DS is now regularly performed at over thirty university and non-academic medical centers.[55]  The procedure calls for the creation of a "sleeve-type" gastrectomy[56] to limit oral intake of food and encourage early satiety, followed by construction of an alimentary limb[57] that bypasses a portion of

---

[52] *Id*. at Baltasar *et al.*, *Duodenal Switch: An Effective Therapy for Morbid Obesity — Intermediate Results*, 11 Obes. Surgery ___ (2001) (Baltasar *et al.*) (pp. 190-194), p. 190 (beginning page number in original publication unclear from Administrative Record).

[53] *Id*. at Alex MacGregor, *The Story of Surgery for Obesity* (2002) (MacGregor) (pp.75-76), p. 76.

[54] Doc. no. 9, Hess & Hess, p. 195.  One document on file indicates that "[b]y 2003 there had been at least 10,000 [BPD/]DS procedures performed in North America."  *Id*. at Douglas S. Hess, *Results of Ten Years or More Post-DS* (2003) (Unpublished Hess Study) (pp. 129-133), p. 130.

[55] *Id*. at Baltasar *et al.*, p. 194.

[56] "Gastrectomy" is the "surgical removal of all or part of the stomach."  MERRIAM-WEBSTER'S MEDICAL DICTIONARY (Merriam-Webster, Inc. 2002), *at* http://dictionary.reference.com/browse/gastrectomy (last visited Oct. 3, 2006). *See also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 680 (W.B. Saunders Co. 28th ed. 1994).

[57] Although the court has been unable to locate a precise definition of "alimentary limb," it appears that this refers to the canal created when the small intestine is severed at its beginning portion — called the duodenum — and then fused (or, in medical parlance, "anastomosed") to the

the small intestine called the ileum, in order to induce malabsorption.[58]  One effect of this design is to preserve the pylorus valve at the lower end of the stomach that controls the entrance of food into the upper portion of the small intestine.[59]  The continued presence of the pylorus reportedly "affords normal gastric functioning,"[60] and eliminates "dumping syndrome."[61]

Although more technically demanding than an "open" surgery, both the RNY and the BPD/DS can be performed laparoscopically as well.[62]  Using a laparoscope "improves recovery time and reduces perioperative morbidity."[63]  Other "[a]dvantages

stomach.  Food still flows through this section, but caloric absorption is reduced.  *See, e.g.*, doc. no. 9, Gastric Restrictive Procedures Policy, p. 327.

[58] Doc. no. 21, Defendant's Statement of Undisputed Facts, ¶ 47.

[59] Doc. no. 9, Rabkin, p. 243.

[60] *Id*.

[61] *E.g.*, *id*. at Unpublished Hess Study, p. 133; *id*. at Hess & Hess, pp. 195, 215; *id*. at MacGregor, p. 75; *id*. at Aetna *Clinical Policy Bulletin* (Aetna Policy) (pp. 406-422), p. 414; *id*. at George S.M. Cowan & Arthur Frank, *Medical Management of Obesity* (2001) (Cowan & Frank) (pp. 423-443), p. 430; *id*. at Gary J. Anthone *et al.*, *The Duodenal Switch Operation for the Treatment of Morbid Obesity*, Abstract (Anthone) (pp. 444-445), p. 444; *id*. at Picard Marceau *et al.*, *Malabsorptive Obesity Surgery*, 81 Surgical Clinics of North America 5 (2001) (Marceau *et al.*) (pp. 488-497), p. 490.

[62] *Id*. at Cottam *et al*., p. 479 (noting the need for training and the level of difficulty, but concluding that "[l]aparoscopic bariatric surgery can be safely performed for all types of bariatric operations"); *id*. at Baltasar *et al*., p. 194 (noting that BPD/DS was first performed laparoscopically in 1999 and has proven a viable alternative to "open" surgery); *id*. at Rabkin, p. 245 (noting that the "laparoscopic technique developed for performing [BPD/]DS . . . is available in multiple centers worldwide").

[63] *Id*. at Cottam *et al*., p. 479.  Note that "perioperative" literally refers to "the period extending from the time of hospitalization for surgery to the time of discharge," but it appears that it is often used synonymously with "post-operative" in the medical literature.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1262 (W.B. Saunders Co. 28th ed. 1994).

of the laparoscopic-assisted approaches include decreased pain, improved pulmonary function in the earlier postoperative period, reduced hospital stay, and a more pleasant cosmetic result."[64]

### 2.    Potential for weight loss:  BPD/DS vs. RNY

Both the RNY and BPD/DS procedures result in considerable weight loss.  The Administrative Record does not contain much weight loss data specific to the RNY, but one article reports that "[l]ong-term weight loss at 5 to 15 years seems to be 49% to 77% of excess body weight."[65]  Several studies of patients undergoing BPD/DS documented similar or better results with that procedure:  "Hess had a [excess body weight reduction] of 80[%] at 2 years and 70[%] at 8 years.  Marceau had a 73% [reduction] at 4.5 years, and 87% of his patients had [an excess body weight reduction greater than] 50[%]."[66]  At 10 years, "Hess has previously reported mean excess weight loss of 73% . . . following open [BPD/DS]."[67]  With respect to laparoscopic

---

[64] Doc. no. 9, Robert A. Rabkin *et al*., *Larparoscopic Technique for Performing Duodenal Switch with Gastric Reduction*, 13 Obes. Surgery 263 (2003) (Rabkin on Laparoscopy) (pp. 448-453), p. 452.

[65] *Id*. at Cottam *et al*., p. 480.

[66] *Id*. at Baltasar *et al.*, p. 193.

[67] *Id*. at Robert A. Rabkin *et al*., *Nutritional Markers Following Duodenal Switch for Morbid Obesity*, 14 Obes. Surgery 84 (2004) (Rabkin *et al.*) (pp. 568-574), p. 569.  Another of Dr. Hess's manuscripts on file indicates that "[w]e have a cohort of 120 patients who are a minimum of ten years post-op.  Of that cohort we have a ten-year follow-up of 112 patients or 93%.  The average excess weight loss at ten years for these patients is 76%." *Id*. at Unpublished Hess Study, p. 129.

BPD/DS, "[p]ublished 10-year data with 93% follow-up demonstrate sustained average loss of 76% of excess weight."[68]

Comparing the two procedures, one publication on file notes that the RNY "can produce an approximate 35% total weight reduction with a 40% to 85% decreased excess body weight," while "[t]he [BPD/DS] procedure results in a 70% to 80% excess weight loss."[69]  This data has led many of the authors of the literature in the Administrative Record to conclude that "BPD-DS is the most effective operation to lose weight."[70]  Indeed, defendant concedes that the BPD/DS yields superior weight loss when compared with the RNY.[71]

### 3.    Complications:  BPD/DS vs. RNY

A review of the literature in the Administrative Record makes plain that surgery to alleviate morbid obesity is not foolproof.  Given the risks associated with that condition, however, neither can it be characterized as foolhardy.  While the

---

[68] *Id*. at Rabkin, p. 243.  *See also id*. at Anthone, p. 444 (noting that BPD/DS resulted in 66% excess weight loss at 5 years).

[69] *Id*. at Cowan & Frank, pp. 429, 430.

[70] Doc. no. 9, Baltasar *et al.*, p. 193.  *See also*, *e.g.*, *id*. at Rabkin *et al.*, p. 573 (concluding that "[l]aparoscopic duodenal switch for morbid obesity affords . . . superior sustained weight loss"); *id*. at Hess & Hess, p. 216 ("In our 20 years of experience, the [BPD/DS] has shown to be the most effective weight loss procedure, for both the morbidly obese and the super morbidly obese patient.").

[71] Doc. no. 24 (Plaintiff's Response in Opposition to Summary Judgment), Plaintiff's Statement of Undisputed Facts, ¶ 34; doc. no. 27 (Defendant's Reply in Support of Summary Judgment), Reply to Plaintiff's Statement of Undisputed Facts, ¶ 34.

morbidly obese are much more likely to develop, among other things, diabetes and life-threatening heart conditions, "it appears that the reduction in incidence of diabetes and cardiovascular risk factors is excellent with either a gastric restrictive or malabsorptive procedure."[72]  To some extent, though, the complications associated with the various procedures differ.

### a.    Death

At the outset, it must be acknowledged that both the RNY and BPD/DS carry at least a marginal risk of death.[73]  Significantly, although each of the articles in the Administrative Record express the view that any loss of life is regrettable, none seem to single out the death rate associated with either surgical procedure as a major surprise.  Dr. Ryce, on the other hand, appears to view the loss of life as a particularly shocking potentiality with the BPD/DS.[74]  Citing a BPD/DS study by Dr. Baltasar, Dr. Ryce points out that "[s]even of his patients suffered serious complications.  Some

---

[72] Doc. no. 9, Medical Policy Reference Manual, p. 350.

[73] See, e.g., id. at TEC, p. 363 (Table 5) (indicating that, in 9 comparative studies, somewhere between 0 to 5% of RNY procedures resulted in death); id. at Anthem Medical Policy, p. 254 (estimating "approximately 1 in 200 [RNY] procedures" result in death and reporting "similar" mortality rates with the BPD/DS); id. at Cottam et al., p. 485 (reporting that the combined results of four studies of laparoscopic BPD without duodenal switch and BPD/DS indicated that "mortality was from 0% to 2.5%"); id. at Unpublished Hess Study, p. 181 (explaining that 6 high risk patients out of 1300, or 0.47%, died due to complications from BPD/DS); id. at Baltasar et al., p. 193 (noting that "[m]ortality rates [after the BPD/DS] range from 0.5 to 2%, most commonly due to pulmonary embolism, respiratory failure and GI leaks"); id. at Hess & Hess, p. 210 (finding a death rate of 0.4% with the BPD/DS patients); id. at Anthone, p. 444 (finding 1.4% mortality with BPD/DS).

[74] See, e.g., doc. no. 22, ¶ 30(j).

-22-

died early, and some died later on; one from liver failure and another from attempts to treat the surgically-induced protein malnutrition."[75]   Of course, Dr. Ryce omits mention of the fact that these two deaths occurred in patients who were undergoing *conversions* from different types of previously performed obesity surgeries.[76]   In fact, "[t]here was no mortality in the 102 primary operated patients" who received BPD/DS without having previously submitted to different sorts of weight loss surgeries.[77] Moreover, one of the two patients was a *super*-morbidly obese individual with a BMI of 94, whereas plaintiff here has a BMI around 43.[78]   On the whole, "[t]he mortality rate for *all* 125 patients [studied by Dr. Baltasar was] 1.6%."[79]   This seems to be consistent with the statement in one document in the file that "[m]ortality [following the BPD/DS] is similar to the Roux Y procedure."[80]

---

[75] *Id*. at ¶ 34(c) (internal citations omitted); *see also id.* at 30(j).

[76] Doc. no. 9, Baltasar *et al.*, p. 191.

[77] *Id*.

[78] *Id*.

[79] *Id*. (emphasis supplied).  *See also* Rabkin on Laparoscopy, p. 452 ("There has been no operative mortality among the more than 500 laparoscopic duodenal switch procedures in our series.").

[80] *Id*. at Anthem Medical Policy, p. 254.  Dr. Ryce does not discuss it in his declaration, but there is an abstract in the Administrative Record suggesting that the mortality with BPD/DS may *be* higher than expected when performed in *super*-morbidly obese patients.  *See id*. at Kim, *Laparoscopic vs. Open Biliopancreatic Diversion with Duodenal Switch: A Comparative Study*, 7 Journal of Gastrointestinal Surgery 552 (2003) (Kim) (pp. 446-447), p. 446 (noting 3 deaths following BPD/DS in a "retrospective study of 54 superobese patients (body mass index >60)" and concluding that "both open and laparoscopic BPD-DS are associated with appreciable morbidity and mortality in the *superobese* population") (emphasis supplied).  Of course, no one disputes that plaintiff is not in the "superobese population," having a BMI of just over 40.  *See id*. at Gastric

### b.    Liver failure

Beyond the risk of death, there are additional side effects common to both procedures.  According to one article in the Administrative Record, "[a]pproximately 95% of all bariatric surgical patients have some [preexisting] liver pathology"[81] — *i.e.*, "[t]he anatomical or functional manifestations of a disease."[82]   It has been suggested that obesity surgery — especially BPD *without* DS[83] — may exacerbate or cause liver problems, and Dr. Ryce mentions this possibility as a potential complication with BPD *with* DS as well.[84]   Indeed, in one study of 440 patients undergoing BPD/DS procedures, one individual died ten months following the operation from what was described as "fatty liver, liver failure, renal failure . . . multiple organ failure."[85]   Another study — the one cited by Dr. Ryce to substantiate his concerns about liver failure with BPD/DS — reported that one patient, out of the 125 who had BPD/DS procedures, passed away due to liver failure.[86]   Liver failure

Restrictive Procedures Form, p. 2.

[81] *Id*. at Cowan & Frank, p. 432.

[82] *See* THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/browse/pathology (last visited Oct. 3, 2006) (defining "pathology"); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1244 (W.B. Saunders Co. 28th ed. 1994).

[83] *See*, *e.g.*, doc. no. 9, Anthem Medical Policy, p. 259.

[84] Doc. no. 22, ¶ 34(c).

[85] Doc. no. 9, Hess & Hess, p. 210.

[86] *Id*. at Baltasar *et al.*, p. 191.  These two studies indicate that Dr. Terry Simpson was close, but mistaken, when he represented in a letter that "there have been no cases of liver failure from the

is thus a possibility, but "is rarely reported" with BPD/DS,[87] and is apparently not a significant concern with RNY either.   In fact, one article suggests that "[t]he correction of the dysmetabolic state associated with obesity also *improves* liver function and morphology. . . . Even when cirrhosis is present, surgery can *reverse* the liver condition."[88]

### c.   Gallbladder removal

Dr. Ryce noted emphatically in his declaration that "Dr. Hess finds it necessary to perform a removal of the gallbladder even if normal, in every patient he does [the BPD/DS] procedure on."[89]   Neither Dr. Hess nor Dr. Ryce explain why this is significant, but other evidence on file suggests that concomitant removal of the gallbladder is not unique to BPD/DS surgeries:  "The gallbladder, draining into the bypassed duodenum following [RNY procedures], becomes not only a useless structure but a liability.  Patients have an approximately 45% chance of developing gallstones or sludge during the 6 months of massive weight loss following bariatric surgery."[90]

---

DS." *Id*. at Letter from Dr. Terry Simpson (pp. 44-46), p. 45.

[87] *Id*. at Baltasar *et al*., p. 194.  *See also id*. at Hess & Hess, p. 215 (reporting that "[l]iver failure, renal failure, severe electrolyte imbalances etc. do not seem to be a problem with [the BPD/DS] if the patients have adequate follow-up and proper supplementation").

[88] *Id*. at Marceau *et al*., p. 493 (emphasis supplied).

[89] Doc. no. 22, ¶ 34(d) (emphasis deleted).

[90] Doc. no. 9, Cowan & Frank, p. 431.

### d.      Anemia, protein deficiency, and other metabolic concerns

Anemia is a concern with both RNY and BPD/DS surgeries.[91]   In his declaration, Dr. Ryce asserts that anemia following BPD/DS soars to 35%, and cites an article that is included in the Administrative Record to support that statistic.[92]  Dr. Ryce is mistaken in this claim, however:  the statistic cited actually refers to anemia levels following BPD procedures *without* the accompanying duodenal switch.[93]  Truth be told, the incidence of post-operative anemia with BPD/DS surgery appears to hover closer to 9%,[94] and even in the BPD *without* DS procedures, where anemia was a more pervasive problem, oral supplementation with iron brought the number of sufferers down to around 5% in at least one study.[95]  Although there is no data on file relating the incidence of anemia with RNY procedures, evidence in the Administrative Record shows that oral supplementation with iron is absolutely essential following RNY procedures as well as BPD and BPD/DS operations.[96]

---

[91] *See, e.g.*, *id*. at Medical Policy Reference Manual, p. 343; *id*. at Hess & Hess, p. 214.

[92] Doc. no. 22, ¶ 34(a).

[93] Doc. no. 9, MacGregor, p. 76.  Amazingly, Dr. Ryce also cites another article discussing BPD *without* DS and notes the 40% incidence of anemia there.  *See* doc. no. 22, ¶ 34(e).  The court emphasizes that these statistics are irrelevant when the procedure  in question is the BPD *with* DS.

[94] *See* doc. no. 9, Hess & Hess, p. 214.

[95] *Id*. at Nicola Scopinaro *et al.*, *Biliopancreatic Diversion* (Scopinaro *et al.*) (pp. 217-236), p. 228.  *See also id*. at Marceau *et al*., p. 495 (reporting that, in BPD-based operations studied, serious anemia occurred in 6% of patients).

[96] *E.g.*, *id*. at ASBS Rationale, p. 507.

According to Dr. Ryce, there is an "11.9% incidence of protein malnutrition" and a "30% incidence of bone loss" following BPD/DS surgery.[97]  These data are drawn from the same article cited to support Dr. Ryce's discredited claim concerning the high rate of anemia following BPD/DS operations.  Again, both the 11.9% protein malnutrition statistic, and the 30% bone loss number, refer to patients who submitted to BPD surgery *without* DS.[98]  As far as the court can tell, that article does not even list bone loss or protein malnutrition as complications associated with the BPD/DS procedure, which is discussed on a separate page.  Even so, other articles do support the claim that these complications occur in BPD/DS patients — just not to a dramatic degree.  In fact, "BPD-DS has almost halved the prevalence of most side effects [of the BPD]."[99]  While only limited bone loss data is included in the Administrative Record, one study reports that, "[i]n a review of 747 patients after BPD [without duodenal switch] or BPD-DS and a mean followup [*sic*] of eight years, the incidence of fracture was 2% per year, which is within the normal limits for the general population."[100]  Moreover, another author calls attention to the fact that "[t]he bone problems caused by BPD [without DS] do not seem to differ substantially from those

---

[97] Doc. no. 22, ¶ 34(a).

[98] *See* doc. no. 9, MacGregor, p. 76.  At some point, the court begins to question whether it is being intentionally mislead.

[99] *Id*. at Marceau *et al*., p. 491.

[100] *Id*. at p. 495.

reported after . . . gastric bypass for obesity."[101]  With both RNY and BPD/DS operations, lifelong calcium supplementation is considered "mandatory."[102]

Protein deficiency is a very serious complication that is occasionally confronted in BPD procedures where the patient does *not* also have the duodenal switch.[103]  However, "[t]he yearly hospitalization rate for protein deficiency is about 1% after BPD-*DS*. . . . The yearly revision rate because of hypoalbuminemia [a condition caused by a lack of protein] is 0.1% after BPD-*DS*."[104]  In the Blue Cross and Blue Shield Association's own Medical Policy Reference Manual, it is observed that, "in the duodenal switch group [of one study], there was a lower incidence of metabolic abnormalities such as protein malnutrition, which prompted reversal of the procedure in 1.7% of those undergoing biliopancreatic bypass *versus only 0.1% after the duodenal switch procedure*."[105]  Finally, an abstract in the Administrative Record

---

[101] *Id*. at Scopinaro *et al.*, p. 229.

[102] *Id*. at ASBS Rationale, p. 507.  *See also id*. at Rabkin *et al.*, p. 573.  Additionally, both the RNY and BPD/DS require supplementation for potential vitamin B-12 deficiency.  *See, e.g., id*. at Medical Policy Reference Manual, p. 343 ("Because the normal flow of food is disrupted, there are more metabolic complications [with RNY] compared to other gastric restrictive procedures, including iron deficiency anemia, vitamin B-12 deficiency, and hypocalcemia, all of which can be corrected by oral supplementation."); *id*. at TEC, p. 360 (same); *id*. at Anthem Medical Policy, p. 259 (calling for "regular monitoring" of vitamin B-12 levels following BPD/DS surgery).

[103] *See id*. at MacGregor, p. 76 (reporting protein malnutrition rate of 11.9% following BPD without DS); *id*. at Medical Policy Reference Manual, p. 349 (citing a different study of patients who had BPD without DS operations and noting a protein deficiency rate of 3.4% and a severe protein malnutrition rate of 1.1%).

[104] Doc. no. 9, Marceau *et al*., p. 495 (emphasis supplied).

[105] *Id*. at Medical Policy Reference Manual, p. 349 (emphasis supplied).

-28-

concludes that "[n]o statistically significant . . . difference in the occurrence of deficiency was observed [in patients undergoing BPD as opposed to RNY] for any of the nutritional parameters studied," and that "[t]he incidence of hypoalbuminemia was negligible in both groups."[106]

### e.    Intestinal bacterial overgrowth and diarrhea

Dr. Ryce points to the possibility of intestinal bacterial overgrowth as another "major risk" of the BPD/DS.[107]  In fact, the only article cited to confirm this claim appears to consider intestinal bacterial overgrowth a possibility with all "BPD" procedures, which the authors defines as all operations that "divert[] bile and pancreatic juice from their normal entrance and mov[e] them farther down the alimentary tract."[108]  Among those operations are the BPD *without* DS, the BPD *with* DS, *and the RNY*.[109]  Only after prefacing the discussion with that critical clarification does the article move on to state that "[t]he risks involved with BPD must be emphasized," including the risk of "intestinal bacterial overgrowth."[110]  What is more,

---

[106] *Id.* at Skroubis *et al.*, *Comparison of Nutritional Deficiencies After Roux-en-Y Gastric Bypass and After Biliopancreatic Diversion with Roux-en-Y Gastric Bypass*, 21 Obes. Surgery 551 (2002) (Skroubis *et al.*) (p. 576), p. 576.

[107] Doc. no. 22, ¶ 33(e)(2).

[108] Doc. no. 9, Marceau *et al.*, p. 488.

[109] *See id.* (stating that "[g]astric bypass with short or long Roux-en-Y represents one form of bile diversion" and noting that "[h]ere, BPD will refer to the anatomical change itself, and each procedure will be specifically identified").

[110] *Id.* at p. 494.

the authors conclude their substantive analysis of this risk by stating that "[w]e know that the serious form [of intestinal bacterial overgrowth] is rare, not life-threatening, and usually managed by antibiotics."[111]

Another side effect that is often shared by patients who undergo the BPD/DS and those who choose the RNY is diarrhea.  In the RNY patients, this is often due to the "dumping syndrome" mentioned previously.[112]  The Administrative Record does not reveal the percentage of RNY patients who experience dumping syndrome or post-operative diarrhea, but it does clearly show that those who undergo the BPD/DS do not suffer from dumping syndrome.[113]  One article includes statistics indicating that, of 909 patients who underwent the BPD/DS operation, 9.4% suffered from diarrhea.[114]  In a different study of BPD/DS patients, revisions were performed on 2 patients out of 440 — or around 0.4% — due to excess diarrhea.[115]  Yet another article reports that 1 patient out of 125 studied required a revision due to diarrhea and anal leakage, and concluded that, overall, "[f]requency of stool was not a major problem.  Most patients have 1-2 stools very early in the morning and 1-2 throughout

---

[111] *Id*. at p. 496.

[112] *Id*. at TEC, pp. 360-361.

[113] *E.g.*, *id*. at Marceau *et al*., p. 490.

[114] Doc. no. 9, Marceau *et al.*, p. 491.

[115] *Id*. at Hess & Hess, p. 211.

the rest of the day."[116]

A central difficulty in evaluating all of these studies is the fact that none of the articles in the Administrative Record define what constitutes "diarrhea." One medical dictionary merely states that it is "[e]xcessive and frequent evacuation of watery feces."[117] Nonetheless, after reading the abstract of a published study by Dr. Anthone which reported that the "mean" or average number of bowel movements in patients who underwent the BPD/DS operation was three per day, Dr. Ryce concluded that "[a]bout one half of his patients developed diarrhea post-op."[118] Dr. Ryce does not offer for comparison the average number of daily bowel movements in RNY patients, or the percentage of such patients who suffer from diarrhea. It is noteworthy, however, that the converse of diarrhea — vomiting — is apparently a post-operative side effect in about 25% of RNY patients.[119]

### f.    Reoperation rates

One measure of operational success is the rate of revision, or reoperation. Dr. Ryce notes that two prominent supporters of the BPD/DS procedure — Dr. Douglas

---

[116] *Id*. at Baltasar *et al.*, p. 191.

[117] THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/browse/diarrhea (last visited Oct. 3, 2006). *Accord* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 461 (W.B. Saunders Co. 28th ed. 1994).

[118] Doc. no. 22, ¶ 34(b).

[119] Doc. no. 9, TEC, p (Table IC), p. 400.

W. Hess and Dr. Douglas S. Hess — had to perform revisions on 17 of the 440 patients in their study, for a revision rate of approximately 3.8%.[120]  Charts in the Technology Assessment published by the national Blue Cross and Blue Shield Association reveal reoperation rates as high as 35% and as low as 0% in studies of the RNY procedure.[121]

### g.   Tendency of BPD/DS to reduce certain RNY-specific complications

Although much of the foregoing discussion has confronted complications endemic to the BPD/DS, it should be noted that the BPD/DS actually reduces or eliminates a number of complications associated with the RNY.  One documented difficulty following RNY procedures is painful ulceration in the stomach area, near the anastomotic site.[122]  The evidence indicates, however, that "the addition of the duodenal switch procedure [renders] the possibility of a marginal ulcer . . . remote," and may actually prevent them altogether.[123]  As mentioned above, another source of

---

[120] Doc. no. 22, ¶ 34(d).

[121] Doc. no. 9, TEC, p. 400 (Table IC) (indicating a 35% revision rate in one study of 99 RNY patients, and a 23% reoperation rate in another study of 20 RNY patients).

[122] *Id*. at ASBS Rationale, p. 502 (stating that, with Vertical Banded Gastroplasty and RNY procedures, marginal ulcers and a variety of other early post-operative morbidities may occur at a rate as high as 10%); *id*. at TEC, pp. 363, 400 (documenting ulceration rates following RNY operations at between 3% and 9.5%).

[123] *Id*. at Hess & Hess, pp. 215-216. *See also* doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 31; doc. no. 9, Unpublished Hess Study, p. 133 (noting that "[t]he number of marginal ulcers is reduced from 3% in gastric bypasses to 0.3% in the DS"); *id*. at Anthone, p. 444 (stating that "marginal ulcers were not seen" in his study of BPD/DS patients); *id*. at Cowan & Frank, p. 430

concern for RNY patients is so-called "dumping syndrome," an unpleasant and dangerous condition, which, to be avoided, requires severe dietary limitations.[124] The articles in the Administrative Record are all in agreement that BPD/DS not only reduces, but *totally eliminates*, dumping syndrome.[125] Thus, the vomiting and dietary precautions associated with the RNY are generally not seen with the BPD/DS.[126]

The RNY also presents the risk of chronic gastritis, an inflammation of the mucous membrane that lines the stomach.[127] "Because of the fragile mucosa at the gastrojejunostomy, gastric irritants such as aspirin and non-steroidal anti-inflammatory drugs (NSAIDs) are contraindicated in [RNY] and [BPD without DS]. In contrast, [BPD/]DS patients have available a full range of food and medication

---

(reporting that "patients are unlikely to experience the postoperative dumping syndrome, peptic ulcers, anemia, and malnutrition associated with classic BPD").

[124] *See* doc. no. 9, Anthem Medical Policy, p. 258.

[125] *Id*. at Aetna Policy, p. 414 ("The duodenal switch (DS) is a variant of the biliopancreatic diversion (BPD) with a vertical subtotal gastrectomy and pylorus preservation, which eliminates the 'Dumping Syndrome.'"); *id*. at Hess & Hess, p. 216 (reporting no occurrences of dumping syndrome following BPD/DS). *See also* doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 30.

[126] *See*, *e.g.*, doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 41 (confirming incidence of vomiting with the RNY); doc. no. 9, Baltasar *et al.*, p. 194 ("More than 90% of the [BPD/DS] patients eat any kind of food, and vomiting is extremely rare."); *id*. at Marceau *et al.*, pp. 491, 496 (listing vomiting as a side effect of BPD/DS in only 1.7% of patients studied and noting the absence of any need for dietary restrictions); *id*. at Rabkin, p. 244 (stating eating restrictions are not required for BPD/DS patients).

[127] *See*, *e.g.*, doc. no. 9, Rabkin, p. 244 (noting the problem of gastritis with the RNY); *see also* THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co. 2002), *at* http://dictionary.reference.com/browse/gastritis (last visited Oct. 3, 2006) (defining "gastritis"); DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 680 (W.B. Saunders Co. 28th ed. 1994).

choices."[128]   This is particularly important to the plaintiff in the present action,

because she takes NSAIDs for pain emanating from a foot condition known as plantar

fasciitis.[129]   Undergoing RNY surgery would preclude further reliance on this form

of treatment for her co-morbidities, assuming those conditions persisted following the

procedure.[130]

One condition that would almost certainly remain after a weight loss operation

would be plaintiff's alleged predisposition to stomach and intestinal cancer.[131]

According to plaintiff, visualization of the stomach through an endoscope is an

excellent method of early detection of these cancers.[132]   Although the Administrative

Record does not appear to contain any medical literature confirming (or disproving)

that endoscopy is useful in this regard, both parties agree that the RNY procedure

makes endoscopic visualization of the entire stomach and duodenum impossible.[133]

Conversely, endoscopic visualization remains feasible following the BPD/DS

operation, because there is no division of the stomach into upper and lower

---

[128] Doc. no. 9, Rabkin, p. 244.  *See also* doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 36.

[129] Doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 36.

[130] *Id*. at ¶ 36.

[131] *See* doc. no. 9, Plaintiff's Letter Appealing Coverage Denial (pp. 29-31), p. 30 (claiming to have a family history of gastrointestinal cancer).

[132] *See id*.

[133] Doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 37.

pouches.[134]

## D.    Defendant's Reasons for Classifying the BPD/DS as "Investigational"

As discussed above, defendant was somewhat tight-lipped as to its reasons for refusing to cover the BPD/DS procedure during the internal appeals process, and the Administrative Record in this case reflects that stance.[135]  Dr. Ryce, however, has guided the court through his reasoning in a declaration that includes citations to materials in the Administrative Record.[136]  In addition to attempting to poke holes in the medical literature provided to the court — which, with only one equivocation,[137] wholly endorses the BPD/DS for patients like plaintiff[138] — Dr. Ryce points to the

---

[134] *Id*. at ¶ 37.

[135] Doc. no. 9, Denial Letter from Dr. Hansford, p. 141 (stating simply that the literature reviewed indicated that the BPD/DS has "significant outcome problems").

[136] *See generally* doc. no. 22.

[137] Doc. no. 9, Cottam *et al*., p. 485 (stating that the studies "collectively demonstrate that [laparoscopic] BPD and duodenal switch are feasible with a reasonable perioperative morbidity and mortality in the appropriate populations," but cautioning that "further long-term outcome-based studies with larger sample populations are required before these procedures can be widely recommended").

[138] *Id*. at ASBS Resolution (p. 39), p. 39 (recognizing that the RNY and BPD/DS "have withstood appropriate scrutiny through the literature and experience of surgeons performing those procedures" to be considered "appropriate and accepted remedies"); *id*. at Rabkin, p. 245 ("The long-term efficacy of [BPD/]DS exceeds that of other accepted procedures, and the morbidity is lower . . . DS is generally accepted as superior to [RNY] . . . for patients who require aspirin [or] NSAIDs . . . ."); *id*. at Baltasar *et al*., p. 194 (concluding that "BPD-DS has proved in our hands to be a very effective procedure to control weight in the morbid and super obese patients in an intermediate period"); *id*. at Hess & Hess, p. 216 ("In our 20 years of experience, the [BPD/DS] has shown to be the most effective weight loss procedure, for both the morbidly obese and the super morbidly obese patient."); *id*. at Unpublished Hess Study, p. 133 ("In summary, it can be seen that the [BPD/]DS procedure is a safe and extremely effective procedure for weight loss, in fact more effective long-term than the more commonly used Roux-en-Y gastric bypass surgery."); *id*. at Cowan & Frank, p.

conclusions of his company and other insurers as justification for the continued "investigational" status of the BPD/DS.

Dr. Ryce states in his declaration that he found defendant's own written medical policy on gastric surgery for morbid obesity persuasive.[139]  That policy contains the following discussion of the BPD/DS operation:

> Biliopancreatic Bypass with or without Duodenal Switch has malabsorptive properties and eventual metabolic complications have been demonstrated.  Techniques of gastric bypass that produce clinical manifestation of malabsorption should be used only in selected patients, in whom conventional Roux-en-Y is expected to fail and who are committed to vigilant long-term follow-up needed to minimize the incidence of serious metabolic complications.[140]

Dr. Ryce also cited to a Technology Evaluation Assessment created by the

---

430 (not expressing an opinion as to any technique evaluated, but noting that "[t]he [BPD/DS] procedure results in a 70% to 80% excess weight loss, with 93% good or excellent results"); *id.* at Anthone, p. 444 ("The longitudinal gastrectomy with duodenal switch is a safe and effective primary procedure for the treatment of morbid obesity.") (emphasis deleted); *id.* at Marceau *et al.*, p. 491 (labeling the BPD/DS as "the authors' procedure of choice"); *id.* at Rabkin *et al.*, p. 573 (concluding that laparoscopic BPD/DS "affords the absence of general electrolyte or nutritional deficiencies, available effective correction via oral supplementation if indicated, and superior sustained weight loss and quality of life"); *id.* at Rabkin on Laparoscopy, p. 448 (concluding that "[l]aparoscopic assisted duodenal switch procedure can be performed safely with acceptable operative times and without excess morbidity or mortality"); *id.* at Kim, p. 446 (documenting appreciable mortality with the BPD/DS in the *super*-morbidly obese population, but not commenting on mortality rates in the simply morbidly obese class); *id.* at Scopinero *et al.*, p. 233 (contending that the BPD *without* DS has proved to be "very safe," but again not commenting on the BPD/DS); *id.* at Skroubis *et al.*, p. 576 (finding "no significant difference in the incidence of deficiency of the nutritional parameters studied" between the RNY and the BPD/DS, but not commenting on the relative safety of the operations).

[139] Doc. no. 22, ¶ 33(b).

[140] Doc. no. 9, Gastric Restrictive Procedures Policy, p. 328 (boldface type deleted).

national Blue Cross and Blue Shield Technology Evaluation Center.  According to Dr. Ryce, "[t]he TEC Assessment concludes that there is not sufficient peer-reviewed literature to warrant the increased risks to the patient from a malabsorptive procedure, such as the BPD/DS, versus a gastric restrictive procedure such as the Roux-en-Y procedure that Blue Cross approved."[141]  This characterization of the conclusions in the TEC is only partially correct.  The TEC does in fact conclude that there is insufficient medical evidence to authorize the BPD/DS.  However, the entire purpose of the TEC in the Administrative Record, insofar as evaluation of the BPD/DS and BPD surgeries is concerned, was the possibility of utilizing those surgeries for the treatment of *super*-morbid obesity.[142]  Indeed, on the very page cited by Dr. Ryce, the authors of the TEC pose the question:  "Are outcomes of bilio-pancreatic diversion and/or long-limb gastric bypass as good as outcomes of open gastric bypass *for patients with super-obesity*. . .[?]"[143]

Another source of authority relied upon by Dr. Ryce was the gastric surgery policy of Aetna, a large medical insurance company and third-party payor.[144]  That

---

[141] Doc. no. 22, ¶ 33(c).

[142] Doc. no. 9, TEC, p. 354 ("The purpose of this Assessment is to determine . . . whether variations on gastric bypass (e.g., bilio-pancreatic diversion, long-limb gastric bypass) improve outcomes for patients with *super*-obesity [defined in the TEC as greater than 50 BMI].") (emphasis supplied).

[143] *Id*. at p. 384 (boldface emphasis deleted, other emphasis supplied).

[144] Doc. no. 22, ¶ 33(d).

policy, which is contained in the Administrative Record, provides in pertinent part

as follows:

> Although it appears that open or laparoscopic DS is *a feasible and promising operation resulting in effective weight loss with an acceptable morbidity*, long-term studies are needed to confirm safety of the procedure, the durability of results, and proper patient selection criteria.  At present there is inadequate scientific data to support the performance of this procedure.  Studies of the DS procedure (open or laparoscopic) published to date have been limited to case reports and reports of uncontrolled case series.  Tthere [*sic*] are no published clinical trials directly comparing the DS procedure to established surgical procedures.  Thus, in a recently published review of the evidence, Gentlieschi, et al. (2002) concluded that, based on currently available evidence, the DS procedure appears feasible, but that randomized controlled clinical trials are needed comparing malabsorptive procedures (including the duodenal switch) to other bariatric operations.  The authors concluded that "further studies are needed to determine the safety and effectiveness of this procedure.["] [*sic*] An assessment conducted by the BlueCross BlueShield Association Technology Evaluation Center (2003) stated:  "There are limited data on outcomes of bilio-pancreatic diversion and/or long-limb gastric bypass for patients with *super-obesity*.  There are no high-quality comparative trials and only limited clinical series data for these indications.  These limited data do not establish that these or other variants (e.g., duodenal switch) have any *additional benefit* for patients with *super-obesity*, as compared to gastric bypass."[145]

The Blue Cross and Blue Shield Medical Policy Reference Manual, published

by the national Blue Cross and Blue Shield Association, ostensibly provides further

support for Dr. Ryce's decision:

---

[145] Doc. no. 9, Aetna Policy, p. 415 (emphasis supplied).

As noted in the Policy section, this policy suggests that malabsorptive procedures for treatment of morbid obesity remain investigational. *This interpretation of the term investigational may be questioned* by those who would point out the procedure, particularly the Scopinaro procedure, has been performed for some 20 years with results of large case series reported in the peer-reviewed literature. The percent of excess weight loss, typically at or above 70%, may be higher than that reported with gastric restrictive procedures, reported at around 60%, but higher among those patients who maintain intact stomas. However, one of the criteria used to define the term investigational, as defined in the Introduction to the Medical Policy Reference Manual, is whether the malabsorptive procedures are *at least as good as the alternatives*; i.e., gastric restrictive procedures. This involves a judgment as to whether the acknowledged increased metabolic risks associated with malabsorptive procedures *are more than outweighed* by an increased benefit associated with potentially greater weight loss. While most of the studies of bariatric surgeries report results in terms of weight loss, the degree of weight loss is essentially an intermediate outcome. For questions that ask whether surgery improves health outcome, and/or how much surgery improves outcomes, weight loss by itself is useful only if the relationship between the amount of weight loss and the degree of improvement in health outcomes has been established. *The underlying medical rationale for the surgery, and thus the basis for its coverage eligibility, is not the degree of weight loss, but the decreased risk of the morbid complications of obesity*, i.e. a decreasing incidence of diabetes and cardiac risk factors, among others. . . . A 2003 TEC special report focused on the relationship between weight loss and changes in morbidity after weight loss surgery. While this report concluded that the evidence was sufficient to conclude that surgery improves health outcomes for patients with morbid obesity as compared to nonsurgical treatment, there were inadequate data to draw conclusions as to the relation of increment of weight loss to increment of improvement in health outcome measures. There were also insufficient data to identify a weight loss threshold for success of a surgical procedure.

   *Ideally, one would like to compare the incidence of morbidities*

*in gastric restrictive versus malabsorptive procedures*.  However, there is no report of a head-to-head comparison among similar patients. It is difficult to compare results between case series due to variations in surgical procedures and different outcome measurements.  *In addition, the literature focuses on the degree of weight loss and not the incidence of obesity-related morbidities*.  However, it appears that the reduction in incidence of diabetes and cardiovascular risk factors is excellent with either a gastric restrictive or malabsorptive procedure.  Therefore, this policy regarding the investigational status of malabsorptive procedures is based on the judgment that there is insufficient evidence to demonstrate that the increased risks of malabsorptive procedures compared to restrictive procedures are outweighed by a significantly greater reduction in obesity-related morbidities.[146]

Based on these sources of information, and his own take on the medical literature, Dr. Ryce and defendant continue to assert that the classification of the BPD/DS as "investigational" should be upheld.

On the other hand, plaintiff argues that not only is defendant's classification incorrect, it is also suspect, because the effect of the determination not to authorize the BPD/DS is to save defendant money.  In support of this position, plaintiff submitted along with her summary judgment brief the declaration of Ellen Bell, the Insurance Administrator at the Metabolic Surgery Center in Nashville, Tennessee.[147] According to Bell, the RNY procedure would be billed out at a total price of $30,075, whereas the cost of the laparoscopic BPD/DS operation would be $41,450 — a

---

[146] *Id*. at Medical Policy Reference Manual, p. 350 (endnotes omitted) (emphasis supplied).

[147] Doc. no. 24, Attachment 2 (Declaration of Ellen Bell).  Defendant has moved to strike this and other of plaintiff's submissions.  Doc. no. 26.  The court will address this motion below.

difference of $11,375.[148]  Of that, Bell states that $8,200 would go to the surgeon

performing the procedure for an RNY, and $10,200 would go to the surgeon for a

BPD/DS.  Defendant responds, through Dr. Ryce, by stating that the actual amount

*billed* by the hospital has little or nothing to do with the amount that defendant would

*pay* for a particular procedure.  Rather, Dr. Ryce submits that, "regardless of whether

one compares reimbursement rates for the Roux-en-Y and the BPD/DS for 2004 or

2005, Blue Cross would have provided higher reimbursement in the amount of $542

to a non-participating surgeon (like Dr. Husted) for the approved Roux-en-Y

procedure."[149]

**PART THREE**

*Standard of Review Under ERISA*

As a threshold matter, the court must determine the appropriate standard for

reviewing defendant's interpretation of the policy, because ERISA itself does not

specify the standard applicable to the decisions of a claims administrator or other

fiduciary.  *See Jordan v. Metropolitan Life Insurance Co.*, 205 F. Supp. 2d 1302,

1305 (M.D. Fla. 2002) (citing, *e.g.*, *Marecek v. BellSouth Telecommunications*, 49

F.3d 702, 705 (11th Cir. 1995) (other citation omitted)).

---

[148] Doc. no. 24, Attachment 2, p. 63.

[149] Doc. no. 22, ¶¶ 40, 41, 42 (emphasis deleted).

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. Pivoting off the *Bruch* decision, the Eleventh Circuit has promulgated three standards of review applicable to the decisions of a claims administrator: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interests."[150] *Buckley v. Metropolitan Life Insurance Co.*, 115 F.3d 936, 939 (11th Cir. 1997). Here, the plan grants the claims administrator the discretion to construe the terms of the plan.[151] Further, because defendant both serves as claims administrator and pays claims from its own funds, it has a conflict of interest. *See Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1568 (11th Cir. 1990) (holding that "a strong conflict of interest exists

---

[150] These standards apply not only to an administrator's interpretation of a plan term, such as "investigational," but also to factual decisions of a claims administrator, such as the decision in this case that the relevant research did not establish the BPD/DS procedure as capable of improving net health outcome to the same degree as available alternatives. *See, e.g.*, *Shaw v. Connecticut General Life Insurance Co.*, 353 F.3d 1276, 1284-85 (11th Cir. 2003).

[151] Doc. no. 9, SPD, p. 309 (indicating that defendant is invested with "*discretionary* responsibility and authority to determine claims under the plan, [and] to construe, interpret, and administer the plan") (emphasis supplied). *Cf. Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1989) (finding discretionary authority to have been conferred by very similar language).

when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims"); *see also Fick v. Metropolitan Life Insurance Co.*, 347 F. Supp. 2d 1271, 1285 (S.D. Fla. 2004) ("Under Eleventh Circuit authority, the plaintiff need not prove that the defendant's self-interest was *in fact* a motivating factor in the decision to deny benefits.") (emphasis supplied).  Defendant accordingly concedes that "[t]he heightened arbitrary and capricious standard of review applies in this case because Blue Cross serves both as the insurer and the claims administrator of the Book Systems Plan."[152]

The applicability of the heightened arbitrary and capricious standard does not mean, however, that the conflict of interests is the court's sole (or even primary) focus.  Instead, the court must first determine — on *de novo* review — whether defendant's interpretation of the policy provision at issue was "wrong."  *See HCA Health Services of Georgia v. Employers Health Insurance Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001) ("'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claim administrator's plan interpretation.").  Given the nature of *de novo* review, the court is obliged at this stage to consider all the evidence in the administrative record, *plus* "[relevant] factual

---

[152] Doc. no. 21, p. 47.

opinions and evidence bearing on the claimant's entitlement to benefits that were not part of the administrative record at the time the administrator denied coverage." *Wise v. Hartford Life & Accident Insurance Co.*, 360 F. Supp. 2d 1310, 1325 (N.D. Ga. 2005) (citing *Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989) (concluding that limiting review to the facts available at the time of the administrator's denial "is contrary to the concept of a *de novo* review")).

Only if the court deems the administrator's interpretation to be erroneous on *de novo* review must it proceed further with the analysis. *See*, *e.g.*, *Brown*, 898 F.2d at 1566 n.12 ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary.") (italics supplied); *Freling v. Reliance Standard Life Insurance Co.*, 315 F. Supp. 2d 1277, 1286 (S.D. Fla. 2004) ("[A] court need only consider whether the administrator's decision was 'tainted by self-interest,' if it first finds that the administrator's determination is wrong.") (citation omitted). Simply put, if defendant here correctly concluded that the BPD/DS is "investigational" under the policy held by plaintiff, the inquiry is at an end, and summary judgment is due to be granted in defendant's favor.

However, "[i]f the court determines that the claims administrator's decision is 'wrong,' the court then proceeds to decide whether 'the claimant has proposed a

'reasonable' interpretation of the plan.'" *HCA Health Services of Georgia*, 240 F.3d at 994 (quoting *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir. 1994)). Assuming claimant's position is held to be untenable, summary judgment should be granted to the administrator on that basis alone. *See id.* Alternatively, if the claimant's reading of the provision at issue is reasonable, the court must *again* test the administrator's *wrong* interpretation, this time through the less discerning lense of "arbitrary and capricious" review. *See, e.g., id.*; *Florence Nightingale Nursing Services, Inc. v. Blue Cross/Blue Shield*, 41 F.3d 1476, 1481 (11th Cir. 1995). An administrator's incorrect interpretation is not arbitrary and capricious if it is "reasonable": *i.e.*, if "there was a reasonable basis for the decision, based upon the facts known to the administrator *at the time the decision was made*."[153] *Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1989) (emphasis supplied).

When heightened review is in place, if both the claimant's interpretation and

---

[153] Thus, normally at this stage the court should not permit either party to supplement the administrative record with evidence that was not presented to the administrator in the course of the internal review process. *See Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997) ("Should [the beneficiary] wish to present additional information that might affect the determination of eligibility for benefits, the proper course would be to remand to [the plan administrator] for a new determination.") (quoting *Jett*, 890 F.2d at 1140) (bracketed alterations in original); *cf. Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1328 (11th Cir. 2001) (upholding denial of administrator's request to remand where the administrator "had more than adequate opportunities to establish an administrative record containing evidence contradicting [claimant's] evidence").

the administrator's wrong interpretation are reasonable, there is yet another level of

scrutiny to be applied.  *See HCA Health Services of Georgia*, 240 F.3d at 994 (noting

that, "[t]he reason the claimant's reasonable interpretation does not [automatically]

trump the claims administrator's wrong interpretation is because the plan documents

explicitly grant the claims administrator discretion to interpret the plan").

> Under the heightened arbitrary and capricious standard of review, the
> burden shifts to the claims administrator to prove that its [erroneous, but
> reasonable] interpretation of the plan is not tainted by self-interest.  The
> claims administrator satisfies this burden by showing that its wrong but
> reasonable interpretation of the plan benefits the class of participants
> and beneficiaries.  Even when the administrator satisfies this burden, the
> claimant may still be successful if he can show by other measures that
> the administrator's decision was arbitrary and capricious.  If the court
> finds that the claims administrator fails to show that its plan
> interpretation benefits the class of participants and beneficiaries, the
> claims administrator's plan interpretation is not entitled to deference
> [and the claimant may be entitled to summary judgment].

*Id*. at 994-95 (internal citations omitted).  The court unfolds and applies each step in

this somewhat convoluted analysis below.

## PART FOUR

### *Was Defendant's Decision "Wrong"?*

The initial task before the court is *de novo* interpretation of the policy

provisions at issue.[154]  *See Denton v. First National Bank of Waco*, 765 F.2d 1295,

---

[154] At this stage in the review process, the evidence to be considered is technically not limited
to that appearing in the Administrative Record.  *See Wise v. Hartford Life & Accident Insurance Co*.,

1304 (5th Cir. 1985) ("First, the court must determine the correct interpretation of the Plan's provisions.").  Next, the correct legal interpretation of the policy provisions must be applied to the facts at hand.  *See, e.g., Freling v. Reliance Standard Life Insurance Co.*, 315 F. Supp. 2d 1277, 1287 (S.D. Fla. 2004).  At the outset, the court notes that the policy in question does clearly exclude "investigational" procedures from coverage.[155]  The issue here is simply whether the BPD/DS is properly considered "investigational."

## A.   The Correct Interpretation of the Policy Provisions

The Summary Plan Description defines "investigational" as "[a]ny treatment, procedure . . . that either we have not recognized as having scientifically established medical value, or that does not meet generally accepted standards of medical

---

360 F. Supp. 2d 1310, 1325 (N.D. Ga. 2005) (citing *Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989) (concluding that limiting review to the facts available at the time of the administrator's denial "is contrary to the concept of a *de novo* review")).  Thus, to the extent the material submitted by plaintiff along with her summary judgment brief is relevant, the court would be at liberty to consider it, subject of course to a ruling on defendant's motion to strike that material. *See id*.  Normally, the court would also be required to consider evidence outside the Administrative Record on the issue of defendant's conflict of interests.  *See id*.  In this case, however, none of plaintiff's evidentiary submissions contain any particularly enlightening information that is not already to be found within the Administrative Record.  Indeed, some of plaintiff's submissions — namely, printouts of partially scandalous discussions on internet message boards — have no evidentiary value whatsoever.  Therefore, without even ruling on defendant's motion to strike, the court will confine its review to the evidence in the Administrative Record.

[155] Doc. no. 9, SPD, pp. 312, 313 (providing that "[w]e will not provide benefits for . . . [i]nvestigational treatment") (boldface emphasis deleted).

practice."[156]  Although it might at first appear that this is the definition to be applied by the court on *de novo* review, the terms of the Summary Plan Description indicate otherwise.   The policy contemplates the that initial construction of the "investigational" definition often will be promulgated in internally-produced written medical criteria.[157]   Here, defendant produced the Gastric Restrictive Procedures Policy, which concludes that the BPD/DS falls within the category of "investigational" operations.[158]   Under the terms of the definitional section, since a written policy labeling the BPD/DS as "investigational" has been created, that policy endures until such time as a series of enumerated elements is met.[159]   In this case, Dr. Ryce and defendant's other representatives repeatedly reviewed the materials submitted by plaintiff and determined that the elements listed were not met.   Thus, the court must review not the initial application of the "investigational" definition in the Gastric Restrictive Procedures Policy, but defendant's determination that the BPD/DS did not satisfy the elements necessary to permit removal of the "investigational"

---

[156] *Id*. at pp. 318-19.

[157] *Id*. at p. 318 ("When possible, we develop written criteria (called medical criteria) concerning services or supplies that we consider to be investigational.  We base these criteria on peer-reviewed literature, recognized standards of medical practice, and technology assessments.").

[158] *Id*. at Gastric Restrictive Procedures Policy, pp. 325, 328.

[159] *Id*. at SPD, p. 318 ("If a service or supply is considered investigational according to one of our published medical criteria policies, we will consider it to be non-investigational only if the following requirements are met . . .").

designation.

The Summary Plan Description lists the following five elements as prerequisites to revision of an "investigational" determination:

- The technology must have final approval from the appropriate government regulatory bodies;

- The scientific evidence must permit conclusions concerning the effect of the technology on health outcomes;

- The technology must improve the net health outcome;

- The technology must be as beneficial as any established alternatives; and,

- The improvement must be attainable outside the investigational setting.[160]

Having determined the proper focus of the inquiry, the court must move to the next step in the analysis.

## B.    The Correct Application of the Policy Provisions to the Facts

Significantly, the court need not consider three of the elements listed in the Summary Plan Description. Defendant admits that there is no "government regulatory bod[y]" in the business of approving surgical procedures.[161] Thus, this element is not a barrier to lifting the "investigational" label; it is simply irrelevant in

---

[160] *Id*. at pp. 318-19 (boldface type in original).

[161] Doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 2; doc. no. 27, Defendant's Reply to Plaintiff's Statement of Undisputed Facts, ¶ 2.

this context.  Further, it is apparently conceded that "[t]he scientific evidence . . . permit[s] conclusions concerning the effect of the technology on health outcomes."[162] Defendant's main argument — that the BPD/DS procedure is not as safe or as effective as the RNY procedure — presupposes that there is sufficient data to "permit conclusions" concerning the procedure.[163]  Finally, defendant admits that "[t]he improvement [is] attainable outside the investigational setting," and that, if defendant approved the BPD/DS, plaintiff would have the operation at a non-academic facility.[164]

Ignoring these superfluous elements, the court must evaluate defendant's answers to the two contested questions:  (1) does "[t]he [BPD/DS] . . . improve the net health outcome;" and (2) is "[t]he [BPD/DS] . . . as beneficial as any established alternatives?"[165]

### 1.    Does the BPD/DS improve net health outcome?

---

[162] Doc. no. 9, SPD, p. 318.

[163] *E.g.*, doc. no. 21, p. 57 (explaining that Dr. Ryce's decision was "based upon his conclusion that the medical literature *does not support* the long-term safety and efficacy of the BPD/DS") (emphasis supplied); doc. no. 27, p. 4 (limiting defendant's reasons for non-coverage to the failure to satisfy the "improves net health outcome" and "as beneficial as" elements).

[164] Doc. no. 9, SPD, p. 318; doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 5; doc. no. 27, Defendant's Reply to Plaintiff's Statement of Undisputed Facts, ¶ 5.  *See also* doc. no. 9, Baltasar *et al.*, p. 194 (noting that "[o]ver 30 centers, equally divided between university and non-academic practices, regularly perform the operation").

[165] Doc. no. 9, SPD, p. 318. *See also* doc. no. 21, p. 58 (explaining that defendant's reasoning in denying coverage was that these two elements were not met).

It appears from the briefs that there is some dispute as to the correct application of the term "net health outcome."  Neither party, however, bothers to offer anything other than conclusory arguments that the standard has or has not been met.  The policy does not define the term; and, as far as the court is concerned, there is no need to do so.  Requiring that a procedure improve "net health outcome" is an eminently clear method of describing the need for an analysis of overall results, with an eye toward determining whether a profit was garnered, or a loss was incurred.  Although the standard itself implies a patient-by-patient inquiry, its context (a health insurance policy designed to govern the plans of countless insureds) connotes a universal assessment of patient well-being.  The term is therefore not ambiguous, and no one claims otherwise.  *Cf. Florence Nightingale Nursing Services*, *Inc. v. Blue Cross / Blue Shield*, 41 F.3d 1476, 1481 n.4 (11th Cir. 1995).  Thus, taking account of all patients in the proper category who have undergone the BPD/DS, the question the court must ask is:  did the procedure more often than not leave the patient better off than she was before?[166]

The evidence here is more than sufficient to clear this relatively low hurdle.

---

[166] The court is firmly convinced that this is the proper interpretation of the policy provision. There is no indication that "net health outcome" was meant to be a term of art, and no one has made such an argument.  Nonetheless, in the event that this reasonably plain understanding could be second-guessed, the court rules in the alternative that the term is ambiguous, and must be construed against the drafter, defendant.  *See Florence Nightingale*, 41 F.3d at 1481 n.4.

As recounted exhaustively above, virtually every publication on file wholeheartedly vouches for the efficacy of the BPD/DS procedure.  One article notes that "[t]he [BPD/DS] procedure results in a 70% to 80% excess weight loss, with 93% good or excellent results."[167]   Another study reveals that, five years after undergoing the BPD/DS, 97% of patients observed had lost greater than 50% of their excess weight.[168]  In the face of these numbers, defendant rightly concedes that the BPD/DS yields superior weight loss when compared with the RNY.[169]   At the same time, however, defendant adds the caveat that the attainment of weight loss alone is not enough to call an operation successful.  Indeed, one insurance article aptly observes that "[t]he underlying medical rationale for the surgery, and thus the basis for its coverage eligibility, is not the degree of weight loss, but the decreased risk of the morbid complications of obesity, i.e. a decreasing incidence of diabetes and cardiac risk factors, among others."[170]  Fair enough, but even viewing the studies in the light most favorable to defendant, they reveal that Type II diabetes is cured in around 98% of BPD/DS patients,[171] sleep apnea disappears,[172] and the reduction in cardiac risk

---

[167] Doc. no. 9, Cowan & Frank, p.  430.

[168] *Id*. at Baltasar *et al*., p. 190

[169] Doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶ 34; doc. no. 27, Reply to Plaintiff's Statement of Undisputed Facts, ¶ 34.

[170] Doc. no. 9, Medical Policy Reference Manual, p. 350.

[171] *Id*. at Hess & Hess, p. 195; *id*. at Unpublished Hess Study, p. 131.

[172] *Id*. at Baltasar *et al*., p. 193; *id*. at Unpublished Hess Study, p. 132.

factors is "excellent."[173]

Although it might seem that this evidence alone is sufficient to support a finding of improved health, the benefits must still be reconciled with the complications in order to arrive at a "net" outcome.  The most serious complication of the BPD/DS — and the one principally, if not exclusively, relied upon in defendant's briefs — is protein malnutrition.  If protein malnutrition actually occurred more often than not in BPD/DS patients, the question whether BPD/DS "improves health outcomes" would be a difficult one.  The court would probably be obliged to conclude that net health outcome was *not* improved, because, while the weight loss would ameliorate or eliminate certain morbidities, the life-threatening protein malnutrition would fill their void.

But protein malnutrition is not common by any means.  In fact, the evidence in the Administrative Record shows that, even in those who undergo BPD *without* DS, protein malnutrition occurs in only 11.9%.[174]  This is a significant percentage, no doubt, but still not sufficient to establish that *net* health outcome is not improved in *most* patients.[175]  More importantly, studies verify that this complication is even more

---

[173] *Id*. at Medical Policy Reference Manual, p. 350.

[174] *Id*. at MacGregor, p. 76.

[175] Defendant might respond that the court should be focusing on net health outcome in *each* individual patient.  Of course, this would be directly contrary to the position taken in defendant's reply brief.  There, defendant railed against the possibility of deciding "whether the BPD/DS

-53-

rare in BPD/DS patients.  *Cf. Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1259 (3d Cir. 1993) (holding that "the term 'experimental procedure' must be defined in terms of its particular application, *i.e.*, whether it is an experimental procedure *for the type of tumors involved here*") (emphasis supplied).  Indeed, "[t]he yearly hospitalization rate for protein deficiency is about 1% after BPD-DS."[176]  The Medical Policy Reference Manual upon which defendant relies notes that, "in the duodenal switch group [of one study], there was a lower incidence of metabolic abnormalities such as protein malnutrition, which prompted reversal of the procedure in 1.7% of those undergoing biliopancreatic bypass *versus only 0.1% after the duodenal switch procedure*."[177]  As for the other potential complications and side effects of the BPD/DS, the evidence relayed in the Summary of Relevant Facts, *supra*, amply demonstrates that they are negligible, at best.  In any case, they are comparable or identical to those that are considered by defendant to be accepted risks of the approved RNY operation.

Defendant's oft-stated belief that the risks of the BPD/DS outweigh the

---

procedure is investigational on a patient-by-patient basis" an attempt to "re-write the plan."  Doc. no. 27, p. 3.  The court could not agree more.  Besides, if defendant's policy required a given procedure to improve the net health outcome of *every patient* who receives it, it is difficult to believe that even aspirin would pass muster.

[176] Doc. no. 9, Marceau *et al.*, p. 495.

[177] *Id*. at Medical Policy Reference Manual, p. 349 (emphasis supplied).

benefits is therefore wrong for two reasons.  First, they simply do not.  The TEC and other insurance manuals defendant cites contain plenty of rhetoric expressing grave concerns about protein malnutrition and other metabolic abnormalities, but the proof is in the pudding.  All of the hard evidence indicates that serious complications are very much the exception, not the rule, with the BPD/DS procedure.  Even in the event that complications do occur, it appears that available treatments are often effective. And some of the more trivial risks, such as chronic diarrhea or iron-deficiency anemia — which also represent *exceptions* — are objectively small prices to pay in exchange for relief from diabetes or other serious conditions.

Second, defendant's analysis is based on a flawed understanding of the paradigm put in place by the plan.  The language of the policy does not require defendant to consider mere *potentialities*, or to perform a traditional risk / benefit analysis.  Rather, the inquiry into "improve[d] . . . net health outcome" requires an assessment of the preponderance of *actual results*.  Therefore, it matters little that plaintiff may be, for example, one of the 1% or so of patients who die as a result of the operation.  The question is, on the whole, do most patients experience improved health following the BPD/DS?  Viewing the evidence in the light most favorable to defendant, it is nonetheless patently clear that most patients *do* obtain a net benefit from the procedure.  Defendant's conclusion to the contrary is simply wrong.  *See*,

*e.g.*, *Godfrey v. BellSouth Telecommunications*, *Inc.*, 89 F.3d 755, 758 (11th Cir. 1996).

### 2.     Is the BPD/DS as beneficial as the RNY?

At times, defendant seems to be laboring under an erroneous understanding of the other element that is disputed in this case.  In its reply brief, counsel for defendant explained, "Blue Cross determined that the medical literature does not yet establish that the BPD/DS . . . is *more* beneficial than the Roux-en-Y."[178]  The court is inclined to presume that this crucial alteration in the policy language was a mere slip of the pen.  Still, it is an apt summary of the type of inquiry Dr. Ryce and defendant's other representatives actually appear to have conducted.

The real question in applying the "as beneficial as" element is whether the BPD/DS operation improves net health outcome to the same or similar degree as does the RNY procedure or "any [other] established alternatives."[179]  Presumably, the "established alternatives" language refers to procedures that defendant has previously authorized as non-investigational.  This is particularly significant, for although Dr. Ryce refers to the RNY as having "the most favorable risk/benefit ratio of the most

---

[178] Doc. no. 27, p. 4 (emphasis supplied).

[179] Doc. no. 9, SPD, p. 318.

common bariatric procedures,"[180] defendant also covers another procedure — the Vertical Banded Gastroplasty.[181] Thus, the fact that Dr. Ryce regards the RNY as the premier weight loss procedure on the market apparently does not preclude other procedures from meeting the "as beneficial as" standard. Dr. Ryce's analysis of plaintiff's appeals does not seem to reflect that reality. In his declaration, Dr. Ryce stated that "Blue Cross did approve for coverage the Roux-en-Y, which would have likely resulted in the weight loss she desires and in the marked improvement in or resolution of [plaintiff's co-morbidities]."[182] But the potential of the RNY procedure to resolve plaintiff's problems is not the issue. The issue is whether the BPD/DS procedure would *also* resolve these problems, to the same or similar degree, with the same or similar incidence of complications. In other words, the fact that Dr. Ryce feels the RNY is sufficient is not a reason to refuse to authorize another equally beneficial operation.

What is more, any candid and fair comparison of two surgical procedures should be just that: a comparison. But Dr. Ryce focuses *exclusively* on the marginal risks associated with the BPD/DS, without stopping to acknowledge that all of those

---

[180] Doc. no. 22, ¶ 18. *See also id.* at ¶ 19 (ranking the RNY as "the bariatric surgical procedure of choice").

[181] Doc. no. 9, Gastric Restrictive Procedures Policy, p. 327.

[182] Doc. no. 22, ¶ 36.

risks are also inherent in the approved RNY.  Evidently, Dr. Ryce believes that the

RNY is purely a gastric restrictive procedure, and that, therefore, none of the

complications associated with malabsorptive procedures pertain.[183]  This could not

be further from the truth.[184]  Although the RNY is partially a restrictive procedure,

"there are more metabolic complications compared to other gastric restrictive

procedures, including iron deficiency anemia, vitamin B-12 deficiency, and

hypocalcemia [a condition caused by lack of calcium]."[185]  These are *exactly the same*

complications and side-effects that Dr. Ryce repeatedly attributes solely to

malabsorptive procedures generally, and to the BPD/DS specifically.  Like the

BPD/DS, most of the metabolic complications associated with the RNY, if they even

occur, "can be corrected by oral supplementation."[186] Bottom line, it is no doubt true

that the BPD/DS comes with potentially serious side effects, but this is no different

from the RNY:

> A study by Anthone et al. analyzed the results of 701 patients who
> underwent the duodenal switch procedure at one academic medical
> center over a 10-year-period.  The perioperative mortality rate (1.4%),
> morbidity (2.9% including leaks, wound dehiscence, splenectomy, and

---

[183] *See*, *e.g.*, *id*. at ¶ 33(c).

[184] *See*, *e.g.*, doc. no. 9, TEC, p. 358 (detailing how "[s]ome operations, such as gastric bypass with Roux-en-Y, combine elements of restrictive surgery with malabsorptive surgery"); *id*. at Hess & Hess, p. 215 (noting that the BPD/DS "is both a restrictive and a malabsorption procedure").

[185] Doc. no. 9, Medical Policy Reference Manual, p. 343.

[186] *Id*. at p. 343.

postoperative hemorrhage), and weight loss (66%-73% of excess body weight loss at 3 years) were *comparable to the published results for the Roux-en-Y gastric bypass procedure*.  Anthone also reported that from a metabolic standpoint, the patients in the study faired [*sic*] well with 98% having a normal serum albumin at 3 years.   Additionally, hemoglobin and calcium levels at 3 years appeared *in line with results seen in gastric bypass procedures* and there was no incidence of dumping in those who underwent the duodenal switch procedure.

In another case report by Deveney et al. comparing Roux-en-Y gastric bypass with duodenal switch, the results showed that while the average length of stay was longer for those individuals undergoing duodenal switch, *there were no statistical differences in morbidity or mortality*.  Weight loss was similar in the two groups at 1 and 2 years post-procedure.  Lastly, advocates of the duodenal switch procedure propose that it offers an improved quality of life.[187]

In addition to potentially producing many of the same complications as the RNY, the BPD/DS *reduces* certain side-effects of the RNY.  As discussed above, "[o]perative complications [of the RNY] include [anastomotic] leakage and marginal ulceration at the anastomotic site. . . . Another concern is the [in]ability to evaluate the "blind" bypassed portion of the stomach."[188]  The BPD/DS eliminates ulceration and preserves the ability to view the entire stomach.[189]  It also avoids the notorious "dumping syndrome" that often nags RNY patients.[190]  Patients are free to continue

---

[187] *Id*. at Blue Cross of California, Medical Policy on Surgical Treatment of Morbid Obesity, (pp. 560-566), p. 563 (emphasis supplied).

[188] *Id*. at Medical Policy Reference Manual, p. 343.

[189] Doc. no. 24, Plaintiff's Statement of Undisputed Facts, ¶¶ 31, 37.

[190] *Id*. at ¶ 30.

taking drugs such as aspirin and ibuprofen.[191]    Finally, as observed above, the

BPD/DS results in superior weight loss when compared with the RNY.   These

significant improvements, coupled with the absence of any real difference in

complications, certainly justify the conclusion that the BPD/DS is "as beneficial as"

the RNY.   Again, viewing the facts in the light most favorable to defendant, it was

nonetheless sorely mistaken when it found otherwise.   *See*, *e.g.*, *Godfrey*, 89 F.3d at

758.    Therefore, defendant's determination that the BPD/DS procedure remains

"investigational" was, and is, wholly wrong.   *See HCA Health Services of Georgia*,

*Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001)**.**

## PART FIVE

*Was Defendant's Incorrect Decision Nonetheless Reasonable?*

The court has determined that defendant's decision to classify the BPD/DS as

"investigational" was palpably wrong.   Given that, "if reasonable grounds do not exist

for the administrator's decision, then the decision [must] be deemed to be arbitrary

and capricious," requiring reversal.   *Fick v. Metropolitan Life Insurance Co.*, 347 F.

Supp. 2d 1271, 1281 (S.D. Fla. 2004).   *See also Jett v. Blue Cross & Blue Shield of*

*Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1989).   For all of the reasons already

announced above, and the additional reasons set forth below, the court holds that

---

[191] Doc. no. 9, Rabkin, p. 244.

defendant lacked a reasonable basis for its determination.

The evidence on file makes defendant's assertion that the BPD/DS does not "improve the net health outcome" almost absurd.  Any procedure that results in "a 70% to 80% excess weight loss, with 93% good or excellent results" certainly leaves the majority of patients better off than they were before.[192]  Defendant's fixation on even the most infinitesimal risks, such as liver failure and death, which generally occurred only under the most extreme circumstances (such as reoperations and in *super*-obese patients), suggests that the review process was not an objective assessment of the evidence, but a biased attempt to resist pressures to expand the scope of coverage.

The finding that the BPD/DS is not "as beneficial as" the RNY is flimsy for a variety of reasons.  Defendant *admits* that the BPD/DS produces better weight loss than the RNY.  Therefore, the court need only consider whether defendant's analysis of complications was unreasonable.  Perhaps the most glaring error in this aspect of Dr. Ryce's analysis is his repeated categorization of the RNY procedure as purely "restrictive" and the BPD/DS operation as entirely "malabsorptive."  It is unclear whether this error stems from genuine ignorance as to the fundamental nature of the procedures in question, or from a desire to justify an arbitrary policy decision by

---

[192] *Id*. at Cowan & Frank, p. 430.

hiding behind the alleged stigma of malabsorption.  Regardless, the truth is that neither procedure fits neatly into either category.  Both are hybrid, or "combination," operations.[193]  As such, the BPD/DS and the RNY share the potential for many post-operative metabolic complications incorrectly labeled by Dr. Ryce as serious BPD/DS-specific risks.  The failure to account for the fact that many of the allegedly unacceptable complications were apparently considered worthwhile risks of the approved RNY is indicative of an arbitrary and capricious decision.  In essence, Dr. Ryce "required that a treatment be superior to another existing treatment in order to avoid exclusion under the policy's experimental/investigational language while the language itself requires only that the treatment be [as] effective."  *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 647 (2d Cir. 2002).

Another unpardonable error was Dr. Ryce's repeated citation of statistics documenting complications of the BPD *without* DS, and attributing those statistics to the BPD/DS.  For instance, Dr. Ryce excoriates one author for "fail[ing] to mention the 11.9% incidence of protein malnutrition post-op, or the 35% incidence of anemia, or the 30% incidence of bone loss post-op."[194]  As highlighted in the Summary of Relevant Facts, *supra*, all of these statistics come from an article analyzing

---

[193] *E.g.*, *id.* at Blue Cross Blue Shield of Tennessee Bariatric Surgery Policy , p. 23.

[194] Doc. no. 22, ¶ 34(a).

complications following BPD *without* DS.  It goes without saying that it is arbitrary

and capricious to justify denying a procedure based on statistical data from studies

of an *entirely different procedure*.  Yet Dr. Ryce did this more than once: after

reviewing the Scopinaro article submitted by plaintiff, Dr. Ryce observed the

incidence of protein malnutrition and noted that "40% of his patients developed post-

op anemia."[195]  What Dr. Ryce should have done is exclude this article from his

decision process altogether, for it does not even discuss the BPD/DS.  It is focused

entirely on the BPD *without* DS procedure that Dr. Scopinaro pioneered.

Moreover, Dr. Ryce purports to support his decision to deny coverage of the

BPD/DS by citation to contextually misleading snippets of articles.[196]  At one point,

Dr. Ryce quotes the Anthone article for the proposition that "[b]road acceptance of

this procedure has been impeded because of concerns that the malabsorptive

component may produce serious nutritional complications."[197]  This is an accurate

quotation, but it totally ignores the *conclusion* — that is, "[the BPD/DS] is a safe and

effective primary procedure for the treatment of morbid obesity. . . . [Positive] results

---

[195] *Id*. at ¶ 34(e).

[196] *See, e.g., id*. at ¶ 33(e)(2) (quoting an article from the Administrative Record that discusses the risks of "BPD" and insinuating that these risks pertain specifically to the BPD/DS, when in fact a full reading of the article indicates that the abbreviation "BPD" refers to the BPD, the BPD/DS, *and* the RNY).

[197] *Id*. at ¶ 33(e)(1) (alteration in original).

are achieved without developing significant dietary restrictions or clinical metabolic or nutritional complications."[198]  At other times, Dr. Ryce appears to have focused on the conclusions reached in the literature without considering the goal of the research. As pointed out above, the entire purpose of the TEC relied upon by Dr. Ryce was assessing the possibility of utilizing the BPD/DS surgery for the treatment of *super*-morbid obesity.[199]  It is widely accepted that operating on super-obese patients can be more dangerous.  This, however, did not dissuade Dr. Ryce from presenting the TEC as authority for declining to authorize the BPD/DS for the treatment of *regular* morbid obesity.  Analysis that relies upon that sort of reasoning is not deserving of the deference defendant seeks.

One of the insurance policies upon which defendant relies employs similarly curious citation tactics.  In defendant's Gastric Restrictive Procedures Policy, an article in the Administrative Record is cited for the proposition that "eventual metabolic complications have been demonstrated" with the BPD/DS.[200]  Contrary to the implications in this policy statement, the authors of that study actually concluded that "protein malnutrition is rare," having occurred in only 2 out of 125 patients

---

[198] Doc. no. 9, Anthone, p. 444.

[199] *Id*. at TEC, p. 354 ("The purpose of this Assessment is to determine . . . whether variations on gastric bypass (e.g., bilio-pancreatic diversion, long-limb gastric bypass) improve outcomes for patients with *super*-obesity [defined in the TEC as greater than 50 BMI].") (emphasis supplied).

[200] *Id*. at Gastric Restrictive Procedures Policy, pp., 328, 330.

studied; "[l]iver failure is rarely reported," having occurred in only 1 out of 125 patients studied, and even in that case as a result of "suicidal alcoholism"; and, deficiencies in liposoluble vitamins were non-existent.[201]  The statement in the Gastric Restrictive Procedures Policy is nothing less than an egregious misrepresentation of the evidence, and further undercuts the reasonableness of defendant's decision.

This discussion could go on.  The court is convinced, however, that all of defendant's justifications are sufficiently undermined by the foregoing analysis. Because defendant's decision was both wrong and unreasonable, there is no need to proceed to a conflicts inquiry.  *See Wangenstein v. Equifax, Inc.*, Case No. 05-14288, 2006 WL 2220822, * 5 (11th Cir. Aug. 4, 2006) (explaining that "[i]f no reasonable grounds exist [for the administrator's decision], then [the court must] end the inquiry and reverse the administrator's decision").  Thus, plaintiff must prevail.

## PART SIX

### *Defendant's Failure to Provide Requested Information*

As stated above, several times in her brief plaintiff points out that she requested from defendant a statement explaining the application of the relevant medical and scientific principles to her case.  Although she indisputably received 266 pages of medical literature on the subject, and was told that the denial of coverage was based

---

[201] *Id*. at Baltasar *et al*., pp. 193-194.

on "significant outcome problems" with the BPD/DS, plaintiff is not satisfied. Accordingly, she "reminds the court" that ERISA contains penalty provisions for failure to provide requested information, and that "she has requested all such other relief which the Court determines to be just and proper."[202] Presumably, plaintiff is referring to 29 U.S.C. § 1132(c)(1)(B), which grants the court *discretion* to assess penalties against administrators for failure to comply with requests for information. *Hunt v. Hawthorne Associates*, *Inc.*, 119 F.3d 888, 914 (11th Cir. 1995) ("The imposition of this penalty is committed to the district court's discretion.").

The court is not persuaded that the equities merit an assessment of penalties here.  After all, defendant was not totally unresponsive — its representatives may simply have misunderstood the specificity plaintiff desired.  *See*, *e.g.*, *Martin v. Ingersoll-Rand Co.*, Case No. 2:93-CV-169-WCO, 1995 WL 776944, * 7 (N.D. Ga. Sept. 28, 1995) (noting that a penalty is "appropriate particularly when bad faith on the part of defendant is evident" and then refusing to impose a penalty in light of conclusion that insurance company did not act in bad faith).  In any case, however, the court need not rest its decision solely upon this ground.  Plaintiff's generic request for "all such other relief which this Court determines to be just and proper"[203] is not

---

[202] Doc. no. 24, p. 10 n.4.

[203] Doc. no. 1.

a cause of action, but merely a request that the court employ all remedies at its disposal to redress the grievances *actually stated* in the complaint.  That the court will do in a separate order, but only for the claim that plaintiff has asserted.

## Conclusion

In accordance with the foregoing, plaintiff's motion for summary judgment is due to be granted, but only insofar as she seeks an order overturning defendant's refusal to cover the BPD/DS procedure.  Her request for statutory penalties under 29 U.S.C. § 1132(c)(1)(B) is due to be denied.  Defendant's motion for summary judgment is also due to be denied, and its motion to strike will be denied as moot.[204] An appropriate order will be entered contemporaneously herewith.

DONE this 23rd day of October, 2006.

United States District Judge

---

[204] *See supra* note 154.